UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

In Re:

CHARLES BECKER and
MARY KAY BECKER,                                District Court Case No.: 09-C-170

    Debtors.                                       Bankruptcy Case No. 07-26001

PORTAGE COUNTY BANK,

    Appellant.

v

CITIZENS BANK,

    Appellee.

**DECISION AND ORDER**

This appeal from an order of the bankruptcy court raises the issue of whether a dragnet clause in a residential real estate mortgage secures subsequent business debt incurred by the debtors. The bankruptcy court held that it did not, and the mortgage holder appeals. This court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1). For the reasons that follow, the bankruptcy court's order will be affirmed in part and reversed in part.

**FACTS**

Over the past fifteen years, Debtors Charles and Mary Becker were engaged in the business of acquiring, refurbishing, and renting out residential and commercial real estate. Charles Becker was a real estate broker and operated Post Realty until 2004. In 2004, the debtors acquired Miller

Machined Products, a machine shop in Coloma, Wisconsin, which was generally managed by Charles. (Citizen's Br. in Response, Bankr. Dkt. # 214, at 1; Mem. Dec. at 2, A-3.)

On July 10, 2001, the debtors borrowed $100,000 from Appellant Portage County Bank ("Portage"). In return for the loan, the debtors signed a note payable to Portage for the amount of the loan and granted Portage a mortgage against their home. The mortgage, which was duly recorded, states that it was granted

> in consideration of the sum of ONE HUNDRED THOUSAND AND NO/100 Dollars ($100,000.00), loaned or to be loaned to Charles D. Becker and Mary K. Becker ("Borrower," whether one or more), evidenced by Borrower's note(s) or agreement dated July 10, 2001, the real estate described below, together with all privileges, hereditaments, easements and appurtenances, all rents, leases, issues and profits, all claims, awards and payments made as a result of the exercise of the right of eminent domain, and all existing and future improvements and fixtures (all called the "Property") *to secure the Obligations described in paragraph 5 on the reverse side, including but not limited to repayment of the sum stated above plus certain future advances made by Lender*.

(Appellant's Br. and Appendix at A-16, Doc. # 3 at 34.) (emphasis added). Paragraph 5 of the mortgage provides that the mortgage secured, *inter alia*, "all other additional sums which are in the future loaned by Lender to any Mortgagor, to any Mortgagor and another or to another guaranteed or endorsed by any Mortgagor . . . ." (*Id*.)

After the debtors granted the mortgage on July 10, 2001, Portage made three additional loans of $144,589.37, $59,805.34, and $55,706 to one or both of them between April 28, 2003 and November 11, 2004. Each of the loans was evidenced by a Business Note. The first two were made and signed by Charles and Mary; the third only by Charles, but there is no suggestion that it was without Mary's knowledge and consent. Charles also signed a Business Note for $27,100 on behalf of Miller Machine Products, Inc., on January 23, 2006, which Portage now concedes is not secured

2

by the original mortgage. (Dkt. # 7 at 5.) In any event, each Business Note listed a separate real estate mortgage as security. Each note also acknowledged that it was also secured "by all existing and future security agreements and mortgages between Lender and Maker . . . ." (A-19, 21, and 23.) On November 22, 2004, Appellee Citizens Bank ("Citizens") recorded a mortgage against the debtors' home in the amount of $77,980. The debtors filed a voluntary petition under Chapter 11 on August 1, 2007, and it appears that the sale of the various parcels that secure the separate Business Notes held by Portage will not be sufficient to satisfy the balances due on them. The issue that therefore arises is whether the three Business Notes issued to Portage are also secured by Portage's prior mortgage on the debtors' home. Citizens Bank claims they are not, and the bankruptcy court agreed. It is that decision that is now before this court for review.

**ANALYSIS**

The findings of fact of the bankruptcy court are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004) (citation omitted). Bankruptcy courts generally must look to state law to determine interests in property, including security interests of a mortgagee. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993); *Butner v. United States*, 440 U.S. 48, 54-55 (1979). Where resolution of an issue depends upon Wisconsin law, I must "apply the law that would be applied in this context by the Wisconsin Supreme Court." *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000) (quotation omitted). Here, the facts are essentially undisputed and the issue raised is one of law.

A dragnet clause in a mortgage states that the mortgage is intended to secure not only the loan that is contemporaneous with the execution of the mortgage, but also loans that are made

3

before or after that loan. The Wisconsin Supreme Court addressed the validity of a mortgage dragnet clause in *Capocasa v. First National Bank of Stevens Point*, 36 Wis. 2d 714, 154 N.W.2d 271 (1967). There the Court acknowledged "[t]here is no doubt that mortgages to secure future advances serve a socially and economically desirable purpose." *Id.* at 719. Indeed, the Court noted that "Wisconsin has long recognized that a mortgage can secure future advances and the lien of the mortgage will attach at the time of the mortgage even though the advances are made at a later date." *Id.* (Citing *Carter v. Rewey*, 62 Wis. 552, 22 N.W. 129 (1885); *Wisconsin Planing Mill Co. v. Schuda*, 72 Wis. 277, 39 N.W. 558 (1888); *Claridge v. Evans*, 137 Wis. 218, 118 N.W. 198, 118 N.W. 803, (1908)). However, in *Capocasa* the Court found that the dragnet clause in a residential mortgage was not effective as to a promissory note executed by the plaintiff's estranged husband without her knowledge or consent and for a purpose unrelated to the original mortgage note. Literal enforcement of the clause under those circumstances, the Court said, would result in "the perpetration of an inequitable result not intended by the parties." *Id.* at 720. To avoid such a result, *Capocasa* adopted what the Court referred to as the Iowa rule under which a dragnet clause in a mortgage would have no effect on the interest of a co-mortgager joint owner who had no knowledge of the subsequent loan and did not consent to it. Instead of affecting the whole of the mortgaged property, the clause would subject only the interest of the joint tenant who incurred the additional debt to the mortgage. *Id.* at 725. Thus, in the case before it, the Court held that the estranged husband's liability could be satisfied only out of his half of the proceeds of the house. *Id.* at 727.

If I were to apply *Capocasa* here, I would conclude that all three of the debtors' Business Notes held by Portage are secured by the mortgage on their home. Unlike the plaintiff in *Capocasa*, there is no claim by Mary Becker that any of the three notes were executed without her knowledge

4

and consent. Indeed, she is listed as a maker and signed two of the three. Thus, there is no risk of perpetrating an inequitable result not intended by the parties as there was in *Capocasa*.

Relying on the Wisconsin Supreme Court's later decision in *John Miller Supply Co. v. Western State Bank*, 55 Wis. 2d 385, 199 N.W.2d 161 (1972), however, the bankruptcy court reached a different result. In *Miller Supply*, which arose under Article 9 of the Uniform Commercial Code ("UCC"), the debtor company agreed that its collateral would secure the Supply Company's current loan of one dollar, as well as all other loans and obligations the debtor incurred from that day forward. The term "obligations" was broadly defined to include "all Debtor's present and future debts, obligations and liabilities to [the Supply Company], of whatever nature." *Id.* at 387-88. The Supply Company thereafter loaned $5,000 to the debtor, and entered into a separate contract with the debtor giving it the exclusive right to sell the entire production of gravity grain boxes manufactured by the debtor. Western States Bank later loaned the debtor $90,000 and perfected a security interest in the same collateral. When the debtor defaulted on the loan, Western States took possession of the collateral and sold it for $50,000. The Supply Company then sued Western States, claiming that the debtor owed it not only the $5,000 it had previously loaned it, but also more than $60,000 for breach of the separate contract it had entered into with the debtor. The Supply Company alleged that the entire value of each of its claims was secured by the debtor's collateral and that its security interest in the collateral had priority over the Western State's. The trial court rejected the Supply Company's claim that the debtor's alleged liability to it for breach of contract was secured by the collateral, and the Supply Company appealed.

As the Supreme Court framed the issue on appeal, the sole question presented was whether the security interest in the collateral given to the Supply Company applied to the Supply Company's

5

contingent contractual claims against the debtor. *Id.* at 390. (There was no dispute that the Supply Company's $5,000 loan was secured by the collateral.) In holding that the contingent contract claims were not covered by the security agreement, the *Miller Supply* Court noted that legitimate future advance agreements were validated under the UCC, as they generally were under pre-UCC law. The Court also cautioned "this useful device can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangement claims against the debtor which are unrelated to the course of financing that was contemplated by the parties." *Id.* at 393-94. To guard against such abuse, the Court held that for subsequent indebtedness to be secured by a prior mortgage "it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred." *Id.* at 394. Applying that test to the facts before it, the *Miller Supply* Court concluded "the 'loan and security agreement' is insufficient to secure payment for the contractual breaches which the plaintiff alleges." *Id.*

In this case, the bankruptcy court initially seemed to apply the wrong test. The court stated that a future advance provision will be enforced "only to the extent that the future liabilities sought to be secured were within the contemplation of the parties." (Mem. Dec. at 7, A-8.) But the "contemplation of the parties" test was explicitly rejected in *Capocasa*. 36 Wis. 2d at 724 ("There seems to be no good reason for one who has executed a mortgage with a 'dragnet' clause to be permitted to escape its consequences for his personal borrowing merely because subjectively it was not within his contemplation (contrary to the words of the written instrument) that an additional obligation to the same creditor would subject his property to the 'dragnet' feature of the mortgage."). Although *Miller Supply* seems to suggest that *Capocasa* adopted the "contemplation

6

of the parties" test, the Supreme Court acknowledged more recently in *Mitchell Bank v. Schanke*, 2004 WI 13, ¶ 66, 268 Wis. 2d 571, 676 N.W.2d 849, that this was an "incorrect" statement of the law. Thus, the fact that at the time they executed the mortgage on their home the later business notes may not have been within the contemplation of the debtors or Portage is irrelevant to the issue of whether the notes are secured by the mortgage.

The bankruptcy court also based its determination upon the Court's statement in *Miller Supply* that in order for the dragnet clause to be effective the subsequent debt must be "of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred." (Mem. Dec. at 7, A-8 )(quoting *John Miller*, 55 Wis. 2d at 394, 199 N.W.2d at 165). In deciding whether this "relatedness" requirement was met, the bankruptcy court followed the rationale of a Tennessee bankruptcy court, which held that "a future advance clause could not extend to cover subsequent indebtedness incurred by the debtor for a primarily business purpose unless there was clear evidence establishing a contrary intent." (Mem. Dec. at 9-10, A-10-11 )(citing *In re Johnson*, 9 B.R. 713, 715-17 (Bankr. M.D. Tenn. 1981)). The court noted that courts in Arkansas, Florida and Massachusetts had likewise refused to find subsequent business loans secured by previous home mortgages under similar circumstances. *See Security Bank v. First Nat'l Bank*, 565 S.W. 2d 623 (Ark. 1978); *Garrote v. Ocean Bank*, 713 So. 2d 1095 (Fla. App. 1998); and *Brae Asset Fund, L.P. v. Kelly*, 223 B.R. 50 (D. Mass. 1998). Based on the record before it, the bankruptcy court found no persuasive reason to find that the parties intended the business loans as additional encumbrances on the debtors' homestead. (Mem. Dec. at 11, A-10.) It therefore concluded that the "Beckers' home mortgage secures only the home loan taken out in 2001 and not the subsequent business loans of The Portage County Bank."

7

Later decisions have suggested, however, that relatedness is only required when it is unclear whether the debt in question fits within the express language of the agreement. *Bank of Barron v. Gieseke*, 169 Wis. 2d 437, 456, 485 N.W.2d 426 (Ct. App. 1992) ("A security agreement containing a future advance clause will be effective according to its own terms if those terms or the course of the parties' dealings evidence that the parties' real intent was that their subsequent transactions be covered by the terms of the security agreement.") (citing *Miller Supply*, 55 Wis.2d at 395, 199 N.W.2d at 165); see *also In re James*, 221 B.R. 760, 762-63 (Bankr. W.D. Wis. 1998). To the extent *Miller Supply* held otherwise, it is inconsistent with the current comment to the 2001 revisions to Article 9 which notes that "[t]his Article rejects holdings of cases decided under former Article 9 that applied other tests, such as whether a future advance or other subsequently incurred obligation was of the same or a similar type or class as earlier advances and obligations secured by the collateral." Wis. Stat. § 409.204, UCC comment 5.

But even assuming *Miller Supply* still reflects Wisconsin law, it does not support the bankruptcy court's conclusion here. The obligations that were held unsecured in *Miller Supply* were not loans at all. In fact they were not even obligations. They were contingent contract claims that the Supply Company asserted against the debtor only after the bank sold the collateral. In this case, by contrast, the subsequent obligations arose out of loans made by the same lender to whom the debtors had given the previous mortgage. Indeed, all of the loans appear to have been for the purchase of real estate. In this sense, they are the same class of obligations; they are loans. Whether the proceeds were used for the family business or to purchase or improve the family home does not change the nature of the underlying transaction. To condition the validity of a mortgage on the

8

purpose for which the borrower sought the loan would introduce a level of uncertainty and unpredictability to the transaction that would only add to the cost of borrowing.

*Miller Supply* states that the subsequent obligations should be so related to the primary obligation secured by the instrument that the consent of the debtor to its inclusion may be inferred. 55 Wis. 2d at 394. But here, there is no need to infer the intent of the parties; their intent is clear from the express language of the mortgage and notes they signed. The mortgage expressly states that it secures not only the amount of the loan stated therein, but "all other additional sums which are in the future loaned by Lender to any Mortgagor, to any Mortgagor and another or to another guaranteed or endorsed by any Mortgagor . . . ." (A-17.) And each of the Business Notes signed by the debtors states that "[t]his Note is secured by all existing and future security agreements and mortgages between Lender and Maker . . . ." (A-19, 21, and 23.) The record is bereft of any suggestion that the debtors were unaware that their subsequent business loans were secured by their original home mortgage, and in light of the clear language of the loan documents, any such claim would lack credibility.

Nor can Citizens claim prejudice or surprise. The mortgage Portage held on the debtors' home was recorded, and thus Citizens had at least constructive notice that it secured past and future loans the debtors received from Portage. Presumably, as part of the loan application, Citizens asked the debtors to list their outstanding loans with Portage. Citizens could easily have demanded as a condition of its loan that the debtors satisfy the prior mortgage they had given to Portage. Having failed to take such steps to protect itself, Citizens has only itself to blame for the fact that it now has insufficient security for its loan.

9

In sum, I conclude that the mortgage and notes should be enforced according to their clear and unambiguous terms. The debtors gave Portage a mortgage on their home to secure not only the original loan, but all future loans that Portage made to either or both of them as well. The Business Notes evidencing the subsequent loans acknowledge that they were secured by the mortgage listed in therein and all existing mortgages. Neither Citizens nor the debtors have offered any reason to conclude that enforcement of the home mortgage according to its terms would be inequitable. The bankruptcy court's decision and order holding that the three Business Notes dated April 28, 2003; July 29, 2004; and November 11, 2004 unsecured is therefore **REVERSED**. All three notes are secured by the mortgage on their home which the debtors granted to Portage on July 10, 2001. The bankruptcy court's decision and order is **AFFIRMED** as to the fourth Business Note dated January 23, 2006, on behalf of Miller Machine Products, which Portage concedes is not secured by the previous mortgage.

**SO ORDERED** this  28th   day of August, 2009.

s/ William C. Griesbach
William C. Griesbach
United States District Judge